1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,                    No.  2:05-cr-219-KJM-EFB

11                  Respondent,

12        v.                                       FINDINGS AND RECOMMENDATIONS

13   JOSE ANGEL ZAMORA,

14                  Movant.

15

16          Movant, Jose Zamora, is a federal prisoner, proceeding through counsel, with an amended

17   motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  He challenges

18   his 2006 conviction on one count of possession with intent to distribute methamphetamine, in

19   violation of 21 U.S.C. § 841.  He is presently serving a sentence of 151 months imprisonment.

20          Zamora claims that he was deprived of his Sixth Amendment right to effective assistance

21   of counsel in deciding not to enter a plea of guilty.  Specifically, he claims that his trial counsel

22   was ineffective for failing to advise him on the morning of trial that he could plead guilty to the

23   charge without a plea agreement, and that he could do so on the day of trial.[1]  § 2255 Motion,

24   ECF No. 101 at 10.  For months Zamora had refused all offers of a plea agreement, but he

25   contends that on the morning of trial he would have pleaded guilty with no agreement had his

26   attorney told him he could do so.

27

28          [1] Zamora initially raised two claims in his § 2255 motion.  However, he has since "elected
     to forgo" his second claim.  ECF No. 141 at 2.

1

An evidentiary hearing was held on October 28, 2013.  Attorney Michael Bigelow appeared on behalf of movant Zamora.  Assistant U.S. Attorney Matthew D. Segal appeared on behalf of respondent, the United States.  Having considered the moving and opposing papers filed by the parties, the record in this case, and the testimony during the evidentiary hearing, the court issues the following findings and recommendation.

## FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY

On the night of January 27, 2005, Zamora was arrested in San Joaquin County for possession of methamphetamine and possession of a stolen Hayward Police Department handgun. He was initially charged in state court and was offered a plea agreement that would have resulted in a two-year state prison sentence.  Evidentiary Hearing Transcript (ECF No. 154) (hereinafter "Tr.") at 16.[2]  However, Zamora rejected that offer.  Thereafter, on April 21, 2005, federal charges were initiated with a complaint and arrest warrant.  ECF Nos. 1, 2.  Zamora waived indictment (ECF No. 11) and the United States proceeded by way of a felony Information filed on May 27, 2005, charging Zamora with one count of possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841.[3]  ECF No. 8 at 1.  Although the affidavit in support of the complaint and arrest warrant states that Zamora was in possession of the stolen Hayward Police Department handgun at the time of the drug offense, he was not charged in the Information with the gun offense.  *See* ECF No. 1 at 4; ECF No. 8.  As discussed below, preventing the filing of a gun count was an important concern of defense counsel during the plea negotiations that occurred in the federal case.

The Office of the Federal Defender was appointed and Assistant Federal Defender Dennis Waks assumed representation of Zamora in April 2005.  *See* ECF No. 3.  Assistant Federal Defender Alexandra Negin was later added as counsel of record for Zamora on January 9, 2006, and ultimately tried the case.  ECF No. 21.

/////

---

[2] References to the evidentiary hearing transcript use the transcript page number, not the corresponding ECF page number.

[3] Zamora had approximately 83.07 grams of methamphetamine on his person.  *Id.* at 1.

On December 16, 2005, Zamora filed two motions to suppress.  ECF Nos. 18, 19.  As addressed in detail below, preserving the right to appeal on the issues raised in the suppression motions was also an important consideration for Zamora in deciding whether to enter a plea of guilty or proceed to trial.  Zamora argued in those motions that (1) he was detained on January 27, 2005, without reasonable suspicion, and therefore all evidence and statements obtained as a result of the detention should be suppressed (ECF No. 18); and (2) statements that he made prior to *Miranda*[4] warnings should be suppressed (ECF No. 19).[5]  The court held a hearing on March 9, 2006 (Mot. to Suppress Hr'g Tr. (ECF No. 27)), and an evidentiary hearing on March 28, 2006 (Evidentiary Hr'g Tr. (hereinafter "Hr'g Tr.") (ECF No. 34)).

During the evidentiary hearing, the parties argued extensively regarding whether officers had reasonable suspicion to detain Zamora the night of January 27, 2005.  Hr'g Tr.  The government pointed out that the detectives had received anonymous complaints identifying Victor Pena, a parolee whose home Zamora was in front of at the time of his stop, engaged in "hand-to-hand transactions," and the detectives thereafter observed short-stay traffic during surveillance of Pena's home.  Hr'g Tr. 61.  The government argued, *inter alia*, that, combined with the prior anonymous calls and surveillance, several observations established reasonable suspicion.  Zamora was seen in his car with Pena standing at the driver's side, they were observed in front of Pena's home, and they were engaged in what the officer believed to be "short-stay traffic."  Hr'g Tr. 62.  While questioning the government's counsel on the existence of reasonable suspicion, the court commented that "[t]his is probably the thinnest reasonable suspicion [question] that I've seen in a litigated case."  Hr'g Tr. 64.  Ultimately, on May 10, 2006, the court issued an order denying Zamora's motions to suppress.  ECF No. 29 at 5 ("In the totality of these circumstances, the court finds that the officers had reasonable suspicion to detain Zamora briefly in order to determine his identity and to investigate what he was doing with Pena.").

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] The government stated in its opposition to Zamora's motions to suppress that his "statement given before *Miranda* warnings will not be used in the United States' case-in-chief, but should remain admissible for impeachment."  ECF No. 24 at 2.  Accordingly, this motion to suppress was not addressed during the suppression hearings.

1       Prior to an August 3, 2006, status conference, the government offered Zamora a plea

2   agreement that would have preserved Zamora's right to appeal the denial of his suppression

3   motion.  Zamora had persistently refused to cooperate with the government's investigation and

4   the offer that was extended did not require Zamora to cooperate.  The offer would have resulted

5   in an approximately ten-year sentence.  *See* ECF No. 55-1.  Zamora rejected this plea agreement.

6   *See* Status Conference Tr. 1:18-20, Aug. 3, 2006 (ECF No. 78) (Zamora's counsel confirming

7   that the plea agreement would not be addressed).

8       On the day of trial, August 16, 2006, Zamora's counsel sought permission for Zamora to

9   address the court.  The following colloquy took place between Zamora and the court regarding

10  the March 28, 2006, suppression hearing transcript:

11              THE COURT:  All right.  Mr. Zamora.

12              [ZAMORA]:  Yes, Your Honor.

13              THE COURT:  Speak right into the microphone, please.

14              [ZAMORA]:  Okay.  There's something that I noticed about my
                transcripts, my motion to suppress transcripts.  They're not
15              complete.  There's arguments missing in the transcripts, and they're
                not signed.
16
                THE COURT:  The transcript is not signed?
17
                [ZAMORA]:  Uh-huh.  And there's arguments that were said in
18              court that don't appear in the transcripts.

19              THE COURT:  The transcript isn't generally signed unless it's
                signed by the court reporter.  It's certified by the court reporter, I
20              think.  But you may be thinking of some sort of state court
                procedure, but we don't sign them.
21              But what is it that you think is missing?  I haven't looked at it.

22              [ZAMORA]:  It was something that you said when you were cross-
                examining the witness.
23
                THE COURT:  And what was the topic?
24
                [ZAMORA]:  About the probable cause and them search [sic] me.
25              You were asking them if they seen me handing something to the
                other suspect or --
26
                THE COURT:  I'll look through the transcript perhaps later today
27              or tomorrow and see if there's anything missing, and I'll ask the
                court reporter to recheck the tape on the computer to make sure that
28              --

                                        4

1      [ZAMORA]:  Also there was --

2      THE COURT:  -- everything was printed.

3      [ZAMORA]:  And also there was something that my attorney said
       close to the end of the transcript that doesn't appear there.
4
       THE COURT:  What was that?
5
       [ZAMORA]:   About -- it was something about the Government
6      says that the detective asked me for identification, but she said
       more likely they demanded for license, registration, and insurance,
7      and that doesn't appear there.

8      THE COURT:    Will  you  check  this,  Ms.  Negin  [Zamora's
       counsel]?  I don't have any specific recollection of what you said.
9      It's more likely that I'll remember what I said, egotism being what
       it is.  But perhaps both counsel can look at the transcript and see
10     whether there's something that seems to be missing.
               I gather that this is mainly for the purposes of a potential
11     appeal or the record, not for something that you need to do as part
       of the trial.  Am I right?
12
       MS. NEGIN:  I believe that's true, Your Honor. . . .
13

14   Trial Tr. Vol. 1, 2-3, Aug. 16, 2006 (ECF No. 76).

15        Also on the morning of trial, the court heard oral arguments on Zamora's August 10,

16   2006, motion to suppress post-*Miranda* statements.  ECF No. 35.  Following the hearing, during

17   which one of the arresting officers and Zamora testified, the court denied the motion.  Trial Tr.

18   Vol. 1, 35.  The court later noted during Zamora's November 9, 2006, judgment and sentencing

19   that Zamora "did not testify credibly at the motion to suppress" hearing.  J. and Sentencing Tr. 10,

20   Nov. 9, 2006 (ECF No. 67).

21        Following jury selection on the day of trial, Zamora's counsel conveyed a second request

22   by Zamora to address the court.  The following conversation took place:

23     THE COURT:  What is it, Mr. Zamora?

24     [ZAMORA]:  I want to know what's preventing me from getting a
       humane deal.  The fact that I don't want to snitch or --
25
       THE COURT:  Under the rules, I am not permitted to be involved
26     in plea bargaining in any way.  I'm not permitted to.  So you'll have
       to address those questions to the prosecutor and outside of my
27     presence.

28   Trial Tr. Vol. 1, 127.

5

On August 17, 2006, following a jury trial Zamora was convicted of the charged offense. Trial Tr. Vol. 2, Aug. 17, 2006 (ECF No. 77).  On November 2, 2006, Zamora filed a memorandum in aid of sentencing.  ECF No. 56.  Zamora requested a 120 month sentence, arguing in part that Zamora "told the Court shortly before the start of trial that he was willing to plead guilty but wanted a 'humane' deal."  *Id.* at 2.

During the November 9, 2006 judgment and sentencing, Zamora's counsel Mr. Dennis Waks argued for two levels off for acceptance of responsibility in accordance with the memorandum in aid of sentencing that was filed on November 2, 2006.  J. and Sentencing Tr. 5. Mr. Waks asserted that "morally [Zamora] had an objection to coming in, pleading guilty, and knowing that he was going to get at least ten years."  *Id.* at 6.  Mr. Waks again referred to Zamora's willingness to plead guilty, but that "he was waiting for a humane deal; meaning anything less than ten years."  *Id.*  He argued that Zamora did not "put the government to the task of proving him guilty beyond a reasonable doubt."  *Id.*  When asked by the court if Zamora had anything to say concerning his sentence, Zamora responded, "Do what you wish."  *Id.* at 8.  The court denied Zamora's "motion for a downward departure for acceptance of responsibility in terms of calculating the sentencing guidelines."  *Id.* at 9.  In denying Zamora's request, the court found that "[t]he defense at trial was that the drugs belonged to somebody else, and that was the consistent theme of the defense.  That's not exactly conceding guilt of the defendant or simply putting the government to its proof, that's actually offering an alternative theory of innocence."[6] *Id.*  The court found that Zamora "did not testify credibly at the motion to suppress" hearing, and his statement during the judgment and sentencing did not "bespeak[] somebody who has truly accepted responsibility."  *Id.* at 10.  Zamora was sentenced to 151 months imprisonment.  ECF No. 57.

On November 13, 2006, Zamora filed a notice of appeal, arguing that the arresting officers lacked reasonable suspicion to seize him.  ECF No. 58.  On December 10, 2008, the U.S. Court of Appeals for the Ninth Circuit affirmed Zamora's conviction, finding "that the police had

---

[6] *See* Trial Tr. vol. 2, 278 (defense counsel Ms. Negin's closing argument begins with "the real drug dealer in this case walked away").

1   reasonable articulable suspicion to justify the initial minimally intrusive stop."  ECF No. 79

2   (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

3       On March 9, 2009, Zamora filed a motion to vacate his sentence pursuant to 28 U.S.C.

4   § 2255.  ECF No. 83.  He later amended his motion on December 23, 2009.  ECF No. 101.  On

5   March 4, 2011, respondent filed its opposition to the motion.  ECF No. 123.  Zamora replied to

6   the opposition on April 8, 2011.  ECF No. 126.

7                    **ZAMORA'S AMENDED MOTION TO VACATE**

8       In his amended motion to vacate, Zamora asserts that "[t]rial counsel [Dennis] Waks was

9   ineffective for failing to advise petitioner that he could plead guilty to the charges without a plea

10  agreement and that he could plead guilty on the day of trial."  ECF No. 101 at 10.  Zamora claims

11  in his motion that "[a]t one point petitioner heard the U.S. Attorney tell trial counsel, Dennis

12  Waks, that they had come too far for a plea, indicating to him that the U.S. Attorney would not

13  permit petitioner to plead guilty.  At no time had petitioner wanted to go to trial. . . .  In addition,

14  had petitioner known that he could still plead guilty on the day of trial, even without a plea

15  agreement, he would have done so because he had never denied the allegations."  *Id.*

16      In its opposition, respondent argues that Zamora "did not plead guilty because in his view,

17  he had not been offered a 'humane' deal."  ECF No. 123 at 8.  Respondent further argues that

18  Zamora would not have pleaded guilty because he "needed to try the case in order to preserve his

19  right to appeal the denial of his motion to suppress."  *Id.*

20      An evidentiary hearing was scheduled by the court, noting that "[r]espondent concedes

21  that an evidentiary hearing is warranted at least with respect to movant's first claim," which is the

22  sole remaining claim before the court.  ECF No. 129 at n.1.

23                            **LEGAL STANDARDS**

24  **I.      28 U.S.C. § 2255**

25      A federal prisoner making a collateral attack against the validity of his or her conviction

26  or sentence must do so by way of a motion to vacate, set aside or correct the sentence pursuant to

27  28 U .S.C. § 2255, filed in the court which imposed sentence.  *Tripati v. Henman*, 843 F.2d 1160,

28  1162 (9th Cir. 1988).  Under § 2255, the federal sentencing court may grant relief if it concludes

1    that a prisoner in custody was sentenced in violation of the Constitution or laws of the United

2    States. *United States v. Barron*, 172 F.3d 1153, 1157 (9th Cir. 1999). To warrant relief, a

3    petitioner must demonstrate the existence of an error of constitutional magnitude which had a

4    substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v.*

5    *Abrahamson*, 507 U.S. 619, 637 (1993).

6         Relief is warranted only where a petitioner has shown "a fundamental defect which

7    inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346

8    (1974).

9    **II.     Ineffective Assistance of Counsel**

10        "The Sixth Amendment guarantees criminal defendants the 'constitutional right to be

11   represented by counsel at all critical stages of the prosecution, including the plea proceeding.'"

12   *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002) (quoting *United States v. Akins*, 276 F.3d

13   1141, 1146 (9th Cir. 2002)). "[T]he decision to reject a plea bargain offer and plead not guilty is

14   also a vitally important decision and a critical stage at which the right to effective assistance of

15   counsel attaches." *United States v. Zelinsky*, 689 F.2d 435, 438 (3d Cir. 1982). In order to

16   prevail on his claim of ineffective assistance of counsel, Zamora must demonstrate an

17   unreasonable error and prejudice flowing from that error. "If a plea bargain has been offered, a

18   defendant has the right to effective assistance of counsel in considering whether to accept it. If

19   that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in

20   a conviction on more serious charges or the imposition of a more severe sentence." *Lafler v.*

21   *Cooper*, __U.S.__, 132 S.Ct. 1376, 1387 (2012).

22        Here, Zamora must first show that, considering all the circumstances, counsel's

23   performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466

24   U.S. 668 (1984). The court must determine whether in light of all the circumstances, the

25   identified acts or omissions were outside the wide range of professional competent assistance.

26   *Strickland*, 466 U.S. at 690. "Review of counsel's performance is highly deferential and there is

27   a strong presumption that counsel's conduct fell within the wide range of reasonable

28   representation." *United States v. Ferreira-Alameda*, 815 F.2d 1251 (9th Cir. 1986).

Second, Zamora must prove prejudice. *Strickland*, 466 U.S. at 693. To demonstrate prejudice, Zamora must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* In other words, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S.Ct. 770, 791-92 (2011) (citation omitted). The focus of the prejudice analysis is on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhard v. Fretwell*, 506 U.S. 364, 372 (1993).

## ANALYSIS

The core allegation of Zamora is that his attorneys did not inform him that he could have pleaded guilty on the morning of trial without any plea agreement, and that proceeding to trial resulted in a longer sentence than he otherwise would have received under an open guilty plea that morning. ECF No. 101 at 10. The thrust of Zamora's argument is that he told his trial counsel he wanted to sign the plea agreement the morning of the trial and, even if the agreement was no longer available, his trial counsel should have advised him that he could plead guilty without a plea agreement that morning. An evidentiary hearing was held on Zamora's claim of ineffective assistance of counsel on October 28, 2013. As discussed below, the court finds that trial counsels' assistance, from Mr. Waks and Ms. Negin, was reasonable and that Zamora's § 2255 motion must be denied.

### I.      Reasonableness

"The first part of the [*Strickland*] inquiry is whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Turner*, 281 F.3d at 879 (internal quotations omitted) (citing *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)). Zamora's evidence must establish that the advice he received regarding plea options was "so incorrect and so insufficient that it undermined his ability to make an intelligent decision about whether" to plead guilty. *Turner*, 281 F.3d at 880 (quoting *United States v. Day*, 696 F.2d 39, 43 (3d Cir. 1992)). As

/////

1  discussed below, Zamora has failed to rebut the strong presumption "that counsel's conduct fell

2  within the wide range of reasonable representation." *Ferreira-Alameda*, 815 F.2d 1251.

3        Zamora testified that on the first day of trial, prior to commencement of the trial, Mr.

4  Waks went over with him how much time he faced if he was convicted. Tr. 16.  Zamora

5  confirmed that he "was not happy" with the government's plea agreement offer that would have

6  resulted in a ten-year sentence, testifying that he thought the offer was "inhumane." *Id.* at 17, 52.

7  Zamora also testified that he believed his suppression motion was "a good argument," and when

8  questioned whether he wanted to preserve his right to appeal he responded that "[i]t was a

9  positive so of course I wanted to preserve a right to appeal." Tr. 50-51.

10       Nonetheless, Zamora also testified that he changed his mind and wanted to take the plea

11 agreement previously offered by the government.  Specifically, Zamora testified that he told Mr.

12 Waks the morning of trial that he "wanted to sign the deal." Tr. 31.  Counsel for respondent on

13 this section 2255 motion, Mr. Segal, questioned Zamora regarding his alleged change in thinking:

14         Q. Okay. You did not ask to plead open, did you?

15         A. No, I did not.

16         Q. You wanted the plea agreement that you had earlier rejected?

17         A. Correct.

18         Q. And the reason you had rejected that earlier plea agreement is
        that the sentence was over 10 years.  Is that right?
19

20         A. Correct.

        Q. And to you that was just too much time to agree to?
21

22         A. Correct.

        Q. So you didn't want to go to trial --
23

24         A. Correct.

        Q. -- but you also didn't want to plead guilty according to any terms
25         that the government was willing to offer you --

26         A. I mean --

27         Q. -- until that day that we're going to talk about in a minute?

28         A. Correct.

Q. Okay. Until the day of trial?

A. Correct.

Tr. 58-59.  Zamora was also questioned by his counsel, Mr. Bigelow, regarding the benefit

Zamora believes he would have received if he had pled "open" without a plea agreement:

> Q. If you had plead [sic] open on the day of trial, what benefit would you have received that you did not receive by going to trial?
>
> A. Acceptance of responsibility.
>
> Q. Had you plead [sic] guilty on the day of trial, do you know how many points you would have received for acceptance of responsibility?
>
> A. Up to three. But I was only going to be given two because that extra point was going to put me below the mandatory minimum and I couldn't get it.
>
> Q. And did you know that when you spoke to [Mr. Waks] and said I want to plead guilty?
>
> A. Correct.

*Id.* at 60.

Assistant Federal Defender Waks, Zamora's trial counsel, also testified during the

evidentiary hearing on the section 2255 motion.  Mr. Waks, a criminal defense attorney for forty

years, described his standard discussion when he meets with clients:

> I will discuss with them their options of going to trial, not going to trial.  I usually basically tell them that they have four options.  One, the case could be dismissed, which is what we hope for.  Two, is that they could go to trial and if they do go to trial they could either do a jury trial, which is 12 people, et cetera.  And/or they could waive trial by jury with the consent of the prosecutor and have a bench trial or what's called a court trial here.  Or you can do what's called a negotiated plea agreement with an agreement between a prosecutor, not the judge.  And then we would talk about an open or plead to the sheet, every place is different.  So, you know, that was kind of the fourth thing that we talked about.

Tr. 66.  Mr. Waks testified that this was the practice he followed when he met with Zamora.  *Id.*

at 67.  Mr. Waks testified that he discussed the following three options with Zamora "on well

more than one occasion."  *Id.* at 82.  He elaborated:

/////

11

The -- probably the worst case would be that if he was indicted for both counts of 10-year mandatory minimum drugs, five-year consecutive sentence gun under [18 U.S.C. §] 924(c), if he was convicted of both of them he was looking at a 15-year mandatory minimum and potentially higher than that because of -- either obstruction or amount of drugs or loss of acceptance of responsibility.

We also talked about if he was indicted for both drugs and guns and he came in and pled to the sheet, meaning that he plead open, no agreement, he would get his acceptance of responsibility and he would probably get 15 years.

Another option was if he pled to the information that was pending at the time, which meant a 10-year mandatory minimum, 10 to life, but 10-year mandatory minimum, no charge for the gun, he would probably still get his acceptance of responsibility and he would get a sentence in the range of 10 to 11 years.

*Id.* at 81. Mr. Waks explained that "very early . . . probably the first time or the second time that I met with [Zamora], we went over all this in detail. And then I met with him obviously a number of occasions. I would say sometime between 10 and 20 times I would guess. And during those 10 to 20 meetings we would talk about open pleas, going to trial, cooperation, 5K, safety valve, defenses, motions, the whole gamut that you would in a normal case." *Id.* at 82. Mr. Waks also described his concern over the possibility of Zamora being charged with the possession of the gun during the charged drug offense. He described a discussion he had with Zamora regarding protection from the handgun charge the government had not yet filed against him:

Q. What legal protection would he have had for a subsequent charge for the 924(c) if he'd just eaten the sheet on the drugs?

A. Well we actually talked about that.

Q. Oh, what did you tell him?

A. And I told him depending on where you were coming from -- the government I should say, not so much you, but if he came in and plead [sic] to the 10-year mandatory minimum, the government would still have the opportunity to come back at a later time within the statute of limitations and file the gun.

. . . .

Q. What was his reaction when you told him that if he were to plead open on the drug charge that he would still be open to a 924(c) charge which would be a five-year mandatory consecutive?

A. Well he was not pleading to anything.

*Id.* at 83-84.  Mr. Waks described Zamora's reaction as persistently of two minds:  Zamora "Didn't want to plead, didn't want to go to trial."  *Id.* at 84.  It was "sometimes frustrating" but a "consistent discussion" with Zamora that "[h]e was not pleading to anything."  *Id.* at 84. Thus, although Zamora did not want to go to trail, "[h]e didn't want to plead guilty.  There was no way that he was going to plead to a 10-year mandatory minimum.  I don't think he ever told me anything different."[7]  *Id.* at 67.  Mr. Waks noted that Zamora had turned down a two-year offer at the state level and "was happy he turned them down" because "[h]e thought it was too much time."  *Id.* at 67-68.  In fact, Mr. Waks did not think Zamora ever told him that if he could get him a two-year sentence that he would take that.  *Id.*  In reviewing his notes, Mr. Waks confirmed that on May 3, 2005, he had his first conversation with Zamora regarding his option to plead open.  *Id.* at 90.  Mr. Waks testified that he spoke with Zamora "four to five" other times regarding whether he could plead open without a plea agreement.  *Id.*; *see also id.* at 101 (Mr. Waks testified that he told Zamora "[p]robably . . . five plus times" that he did not need a formal plea agreement to enter a plea of guilty).

Mr. Waks also testified that preserving Zamora's right to appeal the denial of his motion to suppress was "very significant" to Zamora.  *Id.* at 96.  Yet, even after Mr. Waks had negotiated an offer from the government that would preserve the right to appeal Zamora would not accept the offer.

> Q. All right. And on -- and then the day of the trial confirmation hearing came and did the defendant enter into this plea?
>
> A.  No.
>
> Q. What did he say instead?
>
> A. He said no.
>
> Q. Well did he explain why he wouldn't do this plea that had been negotiated for him?
>
> A. Too much time.
>
> Q. Too much time?

---

[7] Zamora's testimony is, in part, corroborative on this point.  "It had always been in my mind to plead guilty, but up until that point I felt like nothing reasonable had been offered to me. So --."  Tr. 34.

A. Yeah. I mean that -- I don't want to be coy about it, and
I'm not. But his defense was, it's too much time.

*Id.* at 96-97.

Mr. Waks was questioned regarding the morning of trial. He testified that he did not

recall Zamora having second thoughts right before his trial.[8] *Id.* at 95. Mr. Waks also stated that

he did not remember the defendant asking for the plea agreement back. *Id.* at 97 ("I don't

remember that. No." "I don't remember him saying I want this deal back.") Further, Mr. Waks

would have considered it surprising, even shocking, had Zamora had such a change of heart or

had the government been willing to re-extend the offer:

Q. If that -- if defendant had asked for the plea agreement back on
the day of trial, after the trial confirmation hearing and when the
jury is being seated and the government had said sure, fine, take the
plea we offered before, how surprising would that have been?

A. You know, you do this for 40 years, you try not to get too
surprised. I -- but that probably would have surprised me.

Q. How consistent with the practice of my office would that have
been?

A. Oh, from your side?

Q. Yeah.

A. Oh, I would have been shocked on both sides, tell you the truth.
I would have been shocked if you would have said hey, I put all this
time in on this jury trial, we're here the day of trial, yeah let him
take the old deal. I would have been surprised from his side saying
hey, you know, the last year, year and a half that this case has been
going, I change my mind today.

Q. If he had asked to plead open, is that something that you would
have forgotten?

A. No.

Q. Did that ever happen?

A. That he asked to plead open?

Q. Yeah.

A. No.

---

[8] At the commencement of the evidentiary hearing, respondent stipulated that Zamora's
counsel Waks "asked the government to re-extend the offer and the government said no." Tr. 8.

*Id.* at 98-99.  When questioned whether he recalled Zamora requesting him to ask the prosecutor to re-extend the plea agreement, Mr. Waks testified that "[t]hat did not happen."  *Id.* at 107.  Mr. Waks stated that he was "relatively certain" that he "didn't even talk to Mr. Zamora during his trial.  No reason for me to.  I waved at him, you know, when he – I don't remember having any discussions with him.  I'm relatively sure I didn't."  *Id.* at 108.  Mr. Waks had previously explained that although he had handled the case pretrial, and handled the efforts to negotiate a plea agreement, the case was ultimately assigned to Ms. Negin for trial.  *Id.* at 91-92.  Mr. Waks further testified that had Zamora said anything to him, he "would have remembered [Zamora] saying anything different than his, I don't want to take any deals, I want a conditional-type plea."  *Id.* at 108.  Mr. Waks was also questioned regarding his asking the prosecutor to re-extend the plea agreement:

> Q. So just, Mr. Waks, going back . . . to the day of trial. If you asked the prosecutor if some deal were open, that was initiated by you and not at the request of the defendant?
>
> A. Correct.

*Id.* at 112.

The court finds Mr. Waks' testimony credible.  Thus, although Mr. Zamora argues that his counsel was ineffective for failing to advise him the morning of trial that he could plead guilty without a plea agreement, Mr. Waks credibly testified that he previously discussed with Zamora the option of pleading open without a plea agreement at least four to five times.  *See* Tr. 81, 90, 103.  Mr. Waks credibly explained that during the "10 to 20" times he met with Zamora they "would talk about open pleas, going to trial, cooperation, 5K, safety valve, defenses, motions, the whole gamut that you would in a normal case."  *Id.* at 82.  The court finds that his advice was provided to Zamora during the year and a half leading up to his trial.

In contrast, Mr. Zamora's testimony that he did not know he had the right to plead guilty without a plea agreement, or that he would have done so that morning, is simply not credible.  The court finds that Zamora was properly counseled on his plea options prior to his trial, and he was fully aware of the consequences of both pleading guilty with or without a plea agreement, and standing by his plea of not guilty and proceeding to trial.

Further, to the extent Zamora argues that his counsel was ineffective for failing to remind him on the morning of trial that he could plead guilty once he expressed a willingness to sign the plea agreement, the argument is without merit.  First, Mr. Waks testified credibly that he did not recall speaking with Zamora the morning of his trial; and any conversation with the prosecutor regarding a plea agreement that morning was initiated by him, not Zamora.  *Id.* at 108, 112. Secondly, whether Zamora or Mr. Waks first raised the issue is ultimately beside the point.  Even assuming *arguendo* that Zamora did speak with Mr. Waks the morning of trial and expressed an interest in accepting the plea agreement, counsel's conduct was not unreasonable and does not establish ineffective assistance of counsel.

Respondent stipulated that trial counsel asked the prosecutor the morning of trial to re-extend the plea agreement.  *Id.* at 8.  The prosecutor refused to do so.  According to Zamora, after he told trial counsel that he "wanted to sign the deal," *id.* at 31, trial counsel spoke with the prosecutor but did not review Zamora's plea options with him.  However, nothing in Zamora's request necessitated trial counsel to again review with Zamora the range of options, including an open plea of guilty with no agreement.  Zamora said that he requested to enter the earlier offered plea agreement, not to plead open, and Zamora's counsel asked the prosecutor to do just that.  *See id.* at 31, 58.  Zamora had already been informed by counsel of the option to plead open and was fully aware of his plea options by the morning of his trial.  This finding is further bolstered by the fact that Zamora had repeatedly told trial counsel for a year and a half that he was unwilling to plead guilty even with a plea agreement that was far more favorable than the likely consequence of an open plea.  *Id.* at 58-59.  Based on counsel's repeated efforts to secure a favorable plea agreement for Zamora, which Zamora repeatedly refused to accept, there was no reason for counsel to believe that Zamora would agree to plead guilty without any benefit at all from a plea bargain.[9]

_____

[9] Indeed, it strains credulity that Zamora would have considered such an option.  Not only had he repeatedly refused the offer of 10 years, he testified that had turned down an offer of 2 years when the case was in state court.  Tr. 52.  Notwithstanding the seemingly quite effective advocacy by his attorney to negotiate and obtain from the government an agreement not to charge the gun count--with its attendant consecutive sentence, together with an offer of a ten year deal that preserved for appeal the suppression ruling, Zamora nonetheless rebuffed every opportunity to obtain a lesser sentence by way of a guilty plea.

While Zamora testified that he did not want to go to trial, the testimony by trial counsel and Zamora establishes that Zamora was even more committed to not pleading guilty without what he characterized as "a humane deal." Thus, it was reasonable for trial counsel to be informed by Zamora's obstinacy and choose to not again review his plea options that morning. *See* Tr. 98 (Mr. Waks testifying that he "would have been surprised" if Zamora had changed his mind after a year and a half); *Burt v. Titlow*, 571 U.S. ___, ___ (2013) (slip op., at 8) (noting that "[a]lthough a defendant's proclamation of innocence does not relieve counsel of his normal responsibilities under *Strickland*, it may affect the advice counsel gives").

Finally, Assistant Federal Defender Negin, who tried the case, testified that she did not remember Zamora ever asking to plead open.

> Q. Okay. But he never asked to plead open?
>
> A. I don't recall him asking me that.

*Id.* at 137. Neither did she recall Zamora expressing on the morning of trial a desire to plead guilty pursuant to the previously offered plea agreement.

> Q. Did you have a conversation with Mr. Zamora before the Jury -- before you began jury selection, before the jury was in the room, anytime around there, did you have a conversation with Mr. Zamora wherein he said I want to plead guilty to the plea deal?
>
> A. I don't remember that.

Tr. 147. She further testified that she was confident that had Zamora asked her on the morning of trial if he could "take the deal, can we still do it" she would have conveyed that information to the prosecutor. *Id.* at 149. She further stated that if the prosecutor said no, she would have communicated that information back to Zamora and explained that he could not have the plea agreement. *Id.* at 149-50.

Ms. Negin further testified that if Zamora had expressed a willingness to plead guilty on the morning of trial without a plea agreement she does not know--but does not think--that she would have recommended that he do so. She credibly explained the importance to Zamora that

/////

1  he preserve his right to appeal the denial of his motion to suppress.[10] *See* Tr. 150-51. She

2  considered the motion meritorious. She further explained that if Zamora had pled guilty without

3  a plea agreement he would be giving up the right to appeal and there would be no limit to the

4  maximum exposure. Tr. 151 ("I mean yeah, you can tell the person what the guidelines are, but

5  there's no limit on that if you plead open. There's no agreement with the government about two

6  levels off or anything and you're getting ready on the -- you know, to go to trial. Person might

7  not get acceptance."). She further stressed that if Zamora had entered an open plea of guilty on

8  the morning of trial there would be no constraints on the amount of prison time (within the

9  statutory range) the government could argue for at sentencing and he could still have been

10  exposed to a gun charge pursuant to 18 U.S.C. § 924(c), and further, the court might not have

11  accepted his guilty plea pursuant to Fed. R. Crim. P. 11(b).

12      Ms. Negin explained that unless Zamora had specifically stated he wanted to plead guilty

13  without any agreement she would not, on the morning of trial, have gone over that option with

14  him as she was about to start trial. There does not appear to be any reason to have done so here.

15  She had no recall of Zamora saying he wanted to plead guilty that morning. Moreover, as noted,

16  his other attorney, Mr. Waks, testified that he had already explained that option on multiple

17  occasions. He also had been repeatedly told by Zamora that he (Zamora) would not accept the

18  plea offer previously presented.[11] Ms. Negin had already documented Zamora's decision in that

19  regard. She was asked about a letter that she sent to Zamora outlining his decision to reject the

20  government's plea agreement in January 2006. *Id.* at 119. Although Ms. Negin was unable to

21  recall the particular circumstances under which she wrote the letter, she stated that "[i]t is not a

22  standard practice of [her's] to write a letter to a client detailing a plea agreement." *Id.* at 120.

23      _____

24      [10] Ms. Negin confirmed, after reviewing her notes, that she made a note indicating that
    "Jose [Zamora] wants to preserve motion," referring to the denial of Zamora's suppression
    motion. *Id.* at 142.

25      [11] As noted above, Mr. Waks had previously been able to persuade the prosecutor to

26  extend a conditional plea offer that would have preserved the appeal, but Zamora rejected that
    offer. Thus, is it not credible that Zamora had suddenly announced on the morning of trial that he

27  would plead guilty, or would have been willing to plead straight up--with no agreement and
    without preserving the appeal of the suppression ruling. Any such drastic change in position is

28  something trial counsel would remember and neither had any recall of Zamora stating on the
    morning of trial that he wanted to plead guilty.

1    She confirmed from reviewing the letter that she told Mr. Zamora that there was a plea offer of

2    120 months and that he informed her that he rejected that offer.  *Id*. at 120.  As she explained, the

3    decision was Mr. Zamora's.

4         Neither Ms. Negin nor Mr. Waks had any recall of Zamora ever stating that morning that

5    he wanted to plead guilty.  Thus, they had no reason to suggest that he do so without any plea

6    bargain.  Accordingly, Ms. Negin's conduct of concentrating on the trial that was commencing,

7    and not gratuitously reviewing again the option of pleading guilty (with or without a plea

8    agreement) was not only sensible, but it would have been pointless to do otherwise.  The court

9    finds Ms. Negin's explanation for focusing on the trial that was starting and not suggesting an

10   open plea of guilty on the morning of trial is a reasonable and informed strategic decision given

11   Zamora's expressed desire to preserve his right to appeal.  *Burt*, 571 U.S. at ___ (slip op., at 8);

12   *Turner*, 281 F.3d at 880; *see also United States  v. Leonti*, 326 F.3d 1111, 1120 (9th Cir. 2003)

13   (finding defense counsel's conduct in failing to advise the defendant to plead guilty immediately

14   after his arrest did not constitute ineffective assistance because the "decision was tactical").

15        For the reasons stated above, the court finds that Mr. Zamora was properly advised of his

16   right to plead guilty, either with or without a plea agreement, and was fully informed of this

17   option before the morning of his trial.  Moreover, assuming Zamora expressed a desire to accept

18   the earlier offer of a plea agreement, the failure to remind Zamora of his option to plead open the

19   morning of his trial does not render his assistance of counsel ineffective.   Zamora knew his rights

20   and was capable of making an intelligent and informed decision the morning of trial.  Indeed, the

21   prior plea negotiation history demonstrates that he was very much in control of the decisions

22   being made.  Ultimately, it was Zamora's decision whether to choose to plead open.  *Florida v.*

23   *Nixon*, 543 U.S. 175, 187 (2004) ("A defendant . . . has the ultimate authority to determine

24   whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.) (internal

25   quotations and citations omitted).  On this record it can hardly be said that the advice provided to

26   Mr. Zamora by his attorneys was "so incorrect and so insufficient that it undermined his ability to

27   make an intelligent decision about whether" to plead guilty.  *Turner*, 281 F.3d at 880.  Trial

28   counsel adequately informed Zamora of his options.  He was well represented and clearly

1  received effective assistance of counsel.  Indeed, the conduct of Mr. Waks and Ms. Negin fell

2  well within "the wide range of reasonable representation" required by the Sixth Amendment.

3  *Ferreira-Alameda*, 815 F.2d 1251.  Therefore, notwithstanding Zamora's uncorroborated

4  recollection of the events leading up to and including the morning of his trial, the evidence before

5  this court is insufficient to overcome the strong presumption that Zamora's counsel rendered

6  adequate assistance.  *Dows v. Wood*, 211 F.3d 480, 485 (9th Cir. 2000) ("A lawyer generally is

7  presumed competent, and it is the burden of the accused to overcome this presumption.") (citing

8  *United States v. Cronic*, 466 U.S. 648, 658 (1984)); *Burt*, 571 U.S. at ___ (slip op., at 9) ("It

9  should go without saying that the absence of evidence cannot overcome the 'strong presumption

10  that counsel's conduct [fell] within the wide range of reasonable professional assistance.'")

11  (alteration in original) (quoting *Strickland*, 466 U.S. at 689).

12  **II.    Prejudice**

13      Zamora testified that in his discussions with his trial counsel "we never went into detail

14  about an open plea," Tr. 26, and "I was never advised that I had that option to an open plea,"  Tr.

15  27.  As discussed above, his testimony in that regard is simply not credible.  Rather, the court

16  credits the testimony of Mr. Waks that he, in fact, explained that possibility as one of the options

17  for Mr. Zamora.  As apparent from the testimony of Mr. Waks and Ms. Negin, this was not a

18  particularly attractive option for Zamora, but the court finds that it was explained to him and it

19  was ultimately his choice on how to proceed.  Nonetheless, the court turns to the second prong of

20  Strickland.

21      The second prong of *Strickland*'s test "focuses on whether counsel's constitutionally

22  ineffective performance affected the outcome of the plea process."  *Hill*, 474 U.S. at 59.  "In other

23  words, to satisfy the 'prejudice' requirement, [movant] must show that, but for counsel's errors,

24  he would have pleaded guilty and would not have insisted on going to trial."  *Turner*, 281 F.3d at

25  879.  In this case, Zamora must show that he would have pleaded guilty and that the court would

26  have accepted his guilty plea.

27      Zamora argues that he would have pleaded guilty had he "known he could plead guilty,

28  'straight up' and without a plea agreement."  ECF No. 149 at 1.  In support of his argument,

1    Zamora asserts that his sentence would have been 121 months rather than 151 months if he had

2    pleaded guilty rather than gone to trial.  *Id.* at 2.  In response, the government argues that Zamora

3    would not have pleaded guilty because "he wanted to preserve for appeal the district court's

4    denial of his motion to suppress."  ECF No. 150.  For the reasons discussed below, the court finds

5    that Zamora's assertion that he would have pleaded guilty the morning of trial, without a plea

6    agreement, is not credible.  The record belies this assertion and, apart from Zamora's self-serving

7    statements, there is no evidence to establish a reasonable probability that Zamora would have

8    pleaded guilty if trial counsel had, again, presented him with that option on the morning of trial.

9         When Zamora was arrested he had in his possession methamphetamine and a stolen

10   Hayward Police Department handgun.  While the government did not charge Zamora with

11   possession of the handgun, pursuant to 18 U.S.C. § 924(c), Zamora could have been charged if he

12   decided to plead guilty without a plea agreement.  Mr. Waks testified credibly that he discussed

13   with Zamora the possibility that if Zamora pled "to the 10-year mandatory minimum, the

14   government would still have the opportunity to come back at a later time . . . and file the gun

15   [charge]."  Tr. 83.  Indeed, much of Mr. Waks' negotiation efforts were directed at persuading the

16   prosecution to not charge the gun count.[12]  This was discussed with Mr. Zamora several times.

17   Thus, Zamora was aware that if he pleaded guilty without an agreement, in addition to losing his

18   right to appeal the ruling on the suppression motion and having no limitation on the government's

19   position at sentencing, he would also face a potential increase in his 121 month sentence by a

20   consecutive sentence of not less than five additional years.  *See* 18 U.S.C. § 924(c).  Given

21   Zamora's admission that he considered a ten-year sentence "inhumane," *id.* at 52, and had also

22   rejected a two year offer, it is simply not credible that Zamora would have been willing to plead

23   open to a ten-year sentence and expose himself to a consecutive five-year sentence for possession

24   of the handgun while in possession of the methamphetamine.

25        Further, Zamora admitted the importance of preserving the right to appeal the denial of his

26   suppression motion.  By pleading guilty without a plea agreement, Zamora would have lost that

27

28   _____
        [12] Indeed, it appears those effort began early on.  The fact that the federal charges were
     initiated by way of Information rather than an Indictment suggests as much.

1    right.  While Zamora attempted to argue during the evidentiary hearing on his 2255 motion that

2    preservation of the suppression motion was more important to his trial counsel, the record

3    indicates otherwise.  First, Zamora had a discussion with the trial court in which Zamora

4    expressed concern with the accuracy of the suppression motion transcript.  *See* Trial Tr. vol. 1, 2-

5    3.  Specifically, Zamora was concerned that the court's comment during cross-examination

6    regarding probable cause and a comment made by his trial counsel regarding what the officer

7    requested from him during the detention were both missing.  *Id.*  As the court noted during the

8    colloquy, Zamora's concern was likely "for the purposes of a potential appeal."  *Id.* at 3.  Second,

9    both Mr. Waks and Ms. Negin testified credibly that during their representation of Zamora

10   preserving Zamora's right to appeal was very important to Zamora.  Tr. 96, 142.  Finally, Mr.

11   Zamora's own testimony corroborates this.  Tr. 51.  ("I mean it was a positive, so of course I

12   wanted to preserve a right to appeal.").

13          In contrast, there is nothing in the record to support a finding that Zamora was willing to

14   forgo his right to appeal the denial of his motion and plead "straight up" on the morning of trial.

15   Thus, the court finds that Zamora wanted to preserve his right to appeal the denial of his

16   suppression motion and therefore would not have pleaded guilty without a conditional plea

17   agreement because he would have forfeited this right.  A conditional guilty plea was simply no

18   longer an option.

19          Finally, the court rejects Zamora's argument during the evidentiary hearing that his

20   request to accept the plea agreement evinces a willingness to plead open.[13]  Zamora testified that

21   on the morning of trial he told Mr. Waks that he "wanted to sign *the deal*."  Tr. 31 (emphasis

22   added).  Zamora further testified that he did not ask Mr. Waks to plead open.  *Id.* at 58.  As

23   discussed above, the plea agreement provided for a ten-year sentence and preserved Zamora's

24   right to appeal the denial of his suppression motion – a right the court finds was important to

25   Zamora.  Nothing in the record, nor Zamora's testimony, indicates that he was receptive to

26   receiving a ten to fifteen-year sentence and foregoing his right to appeal the denial of his motion.

27

28          [13] The court will assume *arguendo* that Zamora expressed an interest in accepting the plea
     agreement the morning of trial despite this not being reflected in the record or the testimony of
     trial counsel.

1    Likewise, Zamora's colloquy with the trial court the morning of trial indicates that Zamora was

2    interested in a plea agreement, not in pleading open: "I want to know what's preventing me from

3    getting a humane *deal*." Trial Tr. vol. 1, 127 (emphasis added).  The court responded that it was

4    "not permitted to be involved in *plea bargaining* in any way." *Id.* (emphasis added).  Nothing in

5    Zamora's statement to the court suggests a desire to enter an open plea of guilty without any

6    agreement.  Indeed, Zamora conceded at the evidentiary hearing that he was aware of the

7    maximum sentence he was facing, which was in excess of the amount of time he faced under the

8    previous plea offer that he had just characterized that morning as inhumane. *Id.*, and Tr. 27.  It is

9    simply not credible to suggest that he would then immediately be willing to plead guilty with no

10   deal at all.

11       At all times Zamora made it clear to his trial counsel that he considered the offer that he

12   rejected as too much time.  He further testified that although he informed his counsel that he was,

13   in fact, guilty, he was not happy with the amount of time he was facing. Tr. 17.  Thus, it is

14   implausible that Zamora's interest in belatedly accepting the plea agreement equated to Zamora's

15   interest in pleading open when doing so would have waived appeal, placed no limits on the

16   government's sentencing position, and would have done nothing to limit his exposure to a charge

17   for possession of the gun during the commission of the drug offense.  Zamora's self-serving

18   statement that he told counsel the morning of trial that he wanted to accept the plea agreement

19   does not lend itself to a finding that Zamora was willing to plead open.

20       For these reasons, the record and the testimony before this court during the evidentiary

21   hearing are insufficient to establish a substantial likelihood that the result of the proceeding would

22   have been different.[14]  *Strickland*, 466 U.S. at 694; *Harrington*, 131 S.Ct. at 791-92.

23   /////

24   /////

25   /////

26   _____

27   [14] Because the court finds that Zamora would not have pleaded guilty, this court does not make a finding regarding whether the trial court would have accepted his guilty plea pursuant to Rule 11(b) of the Federal Rules of Criminal Procedure.  *See* Fed. R. Crim. P. 11(b) (requiring the

28   court to advise and question the defendant, to ensure the plea is voluntary, and to determine the factual basis for the plea).

**CONCLUSION**

Accordingly, for the reasons set forth above, IT IS HEREBY RECOMMENDED that Zamora's amended motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF No. 101) be denied and that the Clerk be directed to close the companion civil file, No. 2:09-cv-670-KJM-EFB.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, movant may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2255 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  February 3, 2014.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE